IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| NANCY KECSO,<br><br>                    Plaintiff,<br><br>v.<br><br>MEREDITH CORPORATION,<br><br>                    Defendant. | Civil No: 4:04-cv-10484-REL-RAW<br><br><br>RULING AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT |

Plaintiff Nancy Kecso ("Kecso"), pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1132(a)(1)(B), brings this action for judicial review of the denial of long-term disability benefits by her former employer, defendant Meredith Corporation ("Meredith"). In addition to claims brought pursuant to ERISA, Kecso originally asserted that Meredith violated her privacy rights, but Kecso voluntarily dismissed this claim. Workforce Strategies was originally a defendant, but Kecso dismissed her claims against it. Kecso seeks an award against Meredith in the amount of the benefits it denied, attorney's fees, costs, and prejudgment interest. The parties submitted the remaining claims on a stipulated record with cross motions for summary judgment. The matter is fully submitted and ready for ruling. For the reasons articulated below, Kecso's motion will be granted and Meredith's motion will be denied.

## FACTUAL BACKGROUND

On September 13, 2001, Kecso became a full-time database analyst at Meredith and a

participant in Meredith's self-insured sick leave and disability benefits plan (hereinafter "the

plan").  A database analyst is required to work extensively on the computer doing programming,

data analysis, and data entry.  Kecso was a participant in the plan at all times relevant to this

action.

The plan provides full-time employees, including Kecso, with long-term disability

("LTD") coverage in the event that "due to an illness or injury [he or she is] unable to perform

the material duties of [his or her] regular occupation at Meredith , and would be unable to

perform similar duties at any other employer, and . . . [he or she is] under the continuous care of

a physician."  (Plf.'s App., Ex. A at 11.)  The plan grants Meredith discretion in making

determinations of disability:  "Meredith . . . has full discretionary authority to make factual

determinations, including whether you are, or are not disabled, and to interpret the terms of the

Sick Leave/Disability Plan."  (Def.'s Errata  Ex. 1 at 16.)[1]  The plan also describes the applicable

---

[1]Instead of citing to the administrative record that the parties filed as an appendix for
purposes of the cross motions for summary judgment, Meredith cites exhibits to its answer
throughout its statement of material facts and in parts of its brief in support of its motion for
summary judgment.  Additionally, Meredith fails to cite to specific pages of those exhibits.
Local Rule 56.1(a) requires a party moving for summary judgment to file a statement of material
facts and an appendix that complies with LR 56.1(e).  Rule 56.1(e) requires that any referenced
part of the pleadings or exhibits be included in the appendix.  *Id.*  Additionally, "[a]ll references
to supporting documents in a brief, [or] statement of material fact . . . must be to a specific page
number in an appendix."  *Id.*  Rule 56.1(a) requires that "[e]ach individual statement of material
fact must be . . . supported by references to those specific pages . . . of the pleadings . . . [or]
exhibits . . . that support the statement, with citations to the appendix."  LR 56.1(a).

Compliance with the Local Rules is not merely a technical matter.  Rather, compliance
with the Local Rules substantially facilitates the Court's use of materials in addressing a motion
for summary judgment.  Defendant's counsel is encouraged in the future to heed the warning of
Local Rule 1.1(f), which provides that failure to comply with the Local Rules may result in "the
exclusion of evidence, the prevention of witnesses from testifying, the striking of pleadings or
other papers, the denial of oral argument, and the imposition of attorney fees and costs."  LR

decision making process:

> "Meredith . . . will make factual determinations based upon **all information that it considers to be relevant.**  An essential part of that information is the medical evidence that you and your doctor provide to support your claim for benefits.  Your consent to the release of information by your doctor, and your cooperation with information gathering efforts by Meredith . . . is a precondition to eligibility and continued eligibility for benefits.  Failure to cooperate may result in your claim being denied or the discontinuance of benefits under the plan.

(*Id.*)  Finally, "Meredith . . . may consider information in addition to the medical information provided by you and your doctor – this can be any information it consider [sic] relevant.  Meredith . . . may require, at its expense, an examination by one or more additional health care providers or vocational rehabilitation specialists of it's [sic] choosing."  (*Id.*)

On November 13, 2002, Kecso suffered a seizure, and after medical investigation she was diagnosed with a brain tumor (AR at 0261-62).  She was prescribed the anti-seizure medication Dilantin.  Neurologist David Friedgood, D.O., evaluated Kecso on December 3, 2002 and noted she was not tolerating Dilantin well—it was making her lethargic.  (*Id.*)  He switched her prescription to Carbatrol, and Kecso has not suffered another seizure since the first.  Kecso went to the Mayo Clinic in order to explore her surgical and non-surgical options.  (AR at 0262.)  David Piepgras, M.D., evaluated Kecso (AR at 0278) and referred her to neurosurgeon Corey Raffel, M.D., Ph.D.  (AR at 0265.)  Dr. Raffel scheduled a biopsy for January 24, 2003.

---

1.1(f).  The Court seriously considered striking the evidence cited in the brief, the statement of material fact, or the filings as a whole.  Such a sanction would be especially appropriate in this case where Meredith initially denied Kecso's claim for failure to follow the rules of its plan.  However, in the interest of resolving this matter without further delay, the Court will proceed to make its determination on the present record.

3

At a December 27, 2002 appointment, Dr. Friedgood released Kecso to work January 7, 2003.  (AR at 0081, 0140.)  Kecso worked part time between January 7 and January 24, 2003, on which date Dr. Raffel at the Mayo Clinic performed the biopsy and diagnosed the mass as a benign astrocytoma.  (AR at 0265-66.)  Dr. Raffel opined that the tumor did not need to be removed at that point because it was slow growing.  (*Id.*)  He noted that it should be monitored, and if it began to grow faster, it might need to be surgically removed.  (AR at 0265.)  Dr. Raffel released Kecso to work February 10, 2003, but Kecso did not return to work.

After visiting Mayo, Kecso remained under the care of Dr. Friedgood.  (AR at 0046.)  On February 27, 2003, Dr. Friedgood completed a medical certification of disability, which excused Kecso from work indefinitely.  (AR at 0076.)  Again, on March 20, 2003, Dr. Friedgood completed a medical certification noting Kecso's tumor, seizure disorder, and symptoms including fatigue. (AR at 0073.)[2]  Dr. Friedgood continued completing these disability certifications through at least February 4, 2004.  (AR at 0032.)

On May 16, 2003, Dr. Friedgood saw Kecso and noted that she still had intermittent headaches and trouble sleeping and concentrating.  Dr. Friedgood's report does not discuss the etiology, or underlying cause, of these symptoms.  (AR at 0136.)   After Kecso used Family and Medical Leave Act[3] leave and received some short-term disability ("STD") benefits, Meredith approved her for long-term disability ("LTD") benefits, which it began paying on June 1, 2003.  (AR at 0016.)

---

[2]Other symptoms are listed, but are illegible in the appendix.

[3]29 U.S.C. §§ 2601–2654.

4

On August 19, 2003, Kecso visited Jerome Greenfield, M.D., a psychiatrist, on Dr. Friedgood's referral.  (AR at 0100-01.)  Kecso reported to Dr. Greenfield that she took Keppra for seizures, that the ordeal with the astrocytoma had been generally horrible: she had poor sleep, low energy, and a lot of headaches and body aches, but good concentration and focus.  (AR at 0100.)  Dr. Greenfield diagnosed Kecso as depressed and anxious.  He prescribed Zoloft and recommended Kecso attend sessions with therapist[4] Diane Walsh, L.I.S.W.   On August 25, 2003, Kecso returned to Dr. Friedgood, who completed another medical certification of disability  (AR at 0069.)

On August 29, 2003, Kecso had her first appointment with Ms. Walsh.  (AR at 0112.)[5] Ms. Walsh determined that Kecso's vocational, behavioral, and interpersonal functioning was moderately to severely impaired, her affective and neurovegetative functioning was moderately impaired, her cognitive functioning was mildly to moderately impaired, and her overall psychological well being moderately to severely impaired.  (AR at 0112.)  Ms. Walsh noted Kecso needed more sessions and Ms. Walsh expected her to achieve partial remission.  (AR at 0112.)

---

[4]Meredith refers to Ms. Walsh as a psychologist repeatedly in its motions, responses, and briefs.  It does not appear to the Court that any player in the course of Kecso's treatment referred to Ms. Walsh as a psychologist or "Dr. Walsh," except Ms. Diane McGuire, the outside benefits coordinator Meredith hired.  (AR at 0046-47.)  Every physician refers to Ms. Walsh as a therapist.  The Court concludes that this discrepancy is not a genuine issue of material fact; even if the Court viewed Ms. Walsh as a psychologist, it would reach the same ultimate conclusion.

[5]For reasons noted below, Ms. Walsh's progress reports are redacted so that the session notes are not included.  The reports note Ms. Walsh's assessment, Kecso's level of impairment, and her progress.

Kecso visited Dr. Greenfield again on September 10, 2003.  (AR at 0099.)  He reported that Zoloft helped her depression a little.  (*Id.*)  On September 15, 2003 Kecso had another appointment with Ms. Walsh (AR at 0111.)  Kecso's functionality report was substantially better with Ms. Walsh reducing Kecso's vocational limitation from "moderate to severe" to "none." (Id.)  On September 29, 2003, Ms. Walsh, reported Kecso had gotten worse, but still rated her vocational functional limitation as "none."  (AR at 0110.)

On October 7, 2003, Dr. Greenfield reported Zoloft was not helping with Kecso's pain, but her anxiety was better.  (AR at 0098.)  He decided to taper Kecso off of Zoloft and have her switch to Effexor.  (*Id.*)  At her October 15, 2003 appointment with Ms. Walsh, Kecso was again worse functionally, but Ms. Walsh still rated Kecso's vocational limitation "none."  (AR at 0109.)  Dr. Friedgood completed another medical certification of disability on October 25, 2003. (AR at 0066.)  On October 29, 2003, Ms. Walsh again noted Kecso had gotten worse functionally, although the functional limitation ratings were not nearly as bad as the ratings from the first appointment.  (AR at 0108.)  At this appointment, Ms. Walsh rated Kecso as "mildly" impaired vocationally.  (*Id.*)

On November 5, 2003, Dr. Greenfield determined the Effexor was not helping.  (AR at 0096.)  Kecso was tired during the day, and had little motivation or drive.   Dr. Greenfield made no change in his diagnosis of depression and anxiety.  (*Id.*)

On November 10, 2003, Dr. Friedgood examined Kecso.  (AR at 0132-33.)  He first noted Kecso's astrocytoma and that her seizures secondary to the tumor were under good control.  (AR at 0133.)  Kecso complained of chronic fatigue and sensory complaints including a

6

variety of aches and pains the "exact etiology of which is unknown." (AR. at 0133.)  Dr.
Friedgood noted her treatment for an affective disorder, presumably her depression, and that she
had developed a frozen shoulder accompanied by severe pain.

From November 12, 2003, to November 26, 2003, Ms. Walsh noted Kecso went from
better (AR at 0107) to worse (AR at 0106) to better (AR at 0105) from a functional view.  At
each appointment, Ms. Walsh rated Kecso as not vocationally impaired.  Kecso saw Dr.
Greenfield again on December 12, 2003.  (AR at 0095.)  His report notes her continued pain and
her concern about taking ibuprofen or acetaminophen because of side effects.  He noted Effexor
was not helping with her symptoms of depression and that he told her to taper off of Effexor onto
Lexapro.  Kecso reported she felt best when taking a low dose of Effexor, but had tapered onto
Lexapro anyway and experienced vertigo and dizziness.  Dr. Greenfield recommended going
back to a low dose of Effexor.  (AR at 0095.)

In the fall of 2003, Meredith employed Workforce Strategies, an independent consulting
firm, to evaluate Kecso's continued eligibility for LTD benefits.  (AR at 0045.)  Diane McGuire,
an employee of Workforce Strategies was responsible for the evaluation.  Ms. McGuire
interviewed Kecso in December 2003 representing herself as an agent of Meredith responsible
for coordinating Kecso's treatment.  (AR at 0033, 0046.)  Ms. McGuire requested that Kecso
release all medical records related to the treatment of her disability including those from Dr.
Friedgood, Dr. Greenfield, and Ms. Walsh.  (AR at 0045-50.)  The summary description of the
LTD plan[6] notifies employees that their benefits "will stop" if the employee fails to "comply

---

[6]Neither party provided the text of the plan, but both provide summary documents.

with reasonable requests for medical records." (Benefits Handbook, Plf.'s App at 11.)

Initially, Kecso signed a release that allowed Meredith unfettered access to her records. (AR at 0092-93.) After being contacted by Dr. Greenfield and Ms. Walsh, who were concerned about the extent of Meredith's request for records because it was her employer, Kecso revoked her authorization in respect to records from these doctors. Meredith notified Kecso that it would suspend her benefits unless she authorized it to obtain both doctors' records. (AR at 0044.) Kecso then reauthorized Meredith to access all of her medical records with the exception of Ms. Walsh's notes of Kecso's psychotherapy sessions. (AR at 0037.) Kecso asserted that these notes are protected under the Health Insurance Portability and Accountability Act ("HIPPA"), 29 U.S.C. § 1181, and other federal and state privacy laws. (AR at 0037.) She also asserted they were not necessary to Meredith's disability decision.

On December 29, 2003, Kecso again saw Ms. Walsh, who noted similar functional findings as the prior session, including no vocational limitations. (AR at 0104.) On December 31, 2003, Dr. Friedgood, in response to contact from Ms. McGuire, sent her a letter which read, in pertinent part:

> I am following Ms. Kecso for her diagnosis of a brain tumor with secondary seizures. As a result of her condition she suffers from chronic headaches and excessive fatigue. She has been unable to return to her job because of these symptoms. Her medical condition has been stable but I do not know when her secondary conditions will improve to the point where she is able to return to work.

(AR at 0060.) On January 12, 2004, Kecso again visited Dr. Greenfield. (AR at 0094.) Kecso continued to have a great deal of pain in her arms, legs, and trunk. She was intolerant of

antidepressants, her sleep and appetite were fair, but her energy and concentration were fair-to-poor.  (AR at 0094.)  On January 26, 2004, Kecso saw Ms. Walsh who noted her level of functioning was similar with no vocational limitations.   (AR at 0103.)

On February 4, 2004, Dr. Friedgood sent Meredith an updated medical certification of Kecso's disability which read, in pertinent part, "patient is limited by her affective & cognitive response to her brain tumor.  She finds it difficult to function [and] cannot work because of these symptoms." (AR at 0032.)  On February 9, 2004, Ms. Walsh noted that Kecso was mild to moderately limited in her vocational functioning.  (AR at 0102.)  The other functional limitations of Kecso's depression were similar to previous sessions.  (AR at 0102.)

On February 11, 2004, Kecso sent Meredith a letter describing her impressions of McGuire's review of her LTD status.  (AR at 0033-37.)  Kecso noted her displeasure with McGuire telling her that she was hired to coordinate Kecso's treatment, as if McGuire were there to help her.  Kecso noted the McGuire told her that if she did not sign a medical release form, Meredith would terminate her LTD benefits.  With the letter, Kecso enclosed a new release of medical records, which allowed Meredith access to all records except the notes of Kecso's psychotherapy appointments with Ms. Walsh.  On February 13, due to Kecso limiting access to the psychotherapy notes, Meredith suspended her LTD benefits.  (AR at 0016.)[7]

_____

[7]Kecso asserts that Meredith suspended her LTD benefits on January 29, 2004 (Plf.'s Stmt. of Undisputed Material Facts, at ¶ 23), while Meredith asserts it suspended the benefits after February 13, 2004, subsequent to Kecso's release of her mental health records save the psychotherapy notes.  (Def.'s Stmt. of Undisputed Material Facts, at ¶ 26).  Meredith's letter threatening to suspend Kecso's benefits is dated January 29, 2004 (AR at 0044), so this appears to be the reason for the difference.  Despite this minor discrepancy, the parties agree that the reason Meredith suspended the benefit payments was Kecso's refusal to release the

On March 2, 2004, Dr. David Friedgood's certification of disability noted Kecso "is disabled by her subjective complaints of headache, fatigue, [and] cognitive complaints."  (AR at 0025.)  On March 16, 2004, McGuire attempted to obtain a second opinion from another neurologist, who refused to do it.  (AR at 0020.)  On March 17, 2004, Meredith sent a letter to plaintiff notifying her that it had terminated her LTD benefits.  (AR at 0016.)  The letter explained, "Meredith has determined that your benefits were properly discontinued because of your failure to provide the requested medical records from Dianne Walsh, L.I.S.W."

On March 19, 2004, Plaintiff wrote to Meredith and revoked her authorization for Meredith to review her mental health records.  (AR at 0014.)  Kecso asserted in the letter that she felt she had taken every action required of her under the plan and that she did not think that her mental health was related to her disability status, maintaining it was unreasonable for Meredith to require records related to her psychotherapy.  (AR at 0013-15.)  Kecso argued that because she was not receiving psychiatric treatment before having the seizure and being diagnosed with astrocytoma, mental health was not an issue.  Additionally, Kecso noted that she was not receiving mental health treatment when Meredith initially awarded benefits, and it was improper to deny benefits for her failure to disclose medical records related to her mental health.  (AR at 13-14.)  Again, on March 31, 2004, Dr. Friedgood sent Meredith a certification of disability that reported Kecso "is disabled by her subjective complaints of headache, fatigue, [and her] cognitive complaint."  (AR at 0012.)

---

psychotherapy notes.  Meredith did receive all records from Ms. Walsh, however, the notes of Kecso's therapy sessions were redacted from these.  (AR at 0102-112.)

Kecso retained counsel to appeal Meredith's LTD decision, and on May 26, 2004, her counsel sent a letter of appeal to Meredith.  In the letter Kecso re-asserted, through counsel, that records of her mental health treatment were unnecessary to establish her continuing eligibility for LTD benefits because the records in Meredith's possession amply demonstrated her disability.  Kecso's counsel also noted, repeatedly, that Kecso has a brain tumor, which he argued was obviously and intrinsically disabling.

Meredith's counsel responded to Kecso's letter on June 9, 2004, noting that Meredith needed the records of Kecso's mental health treatment to resolve inconsistencies in the records it received.  Kecso's counsel responded that the bottom line was that Kecso had a brain tumor and that her disability claim was dependant on "the limitations upon her ability to physically perform by the brain-tumor, not the psychological effects caused by someone suffering from such a malady." (Def.'s Errata Ex. 2 at 32.)  Meredith interpreted this statement as Kecso requesting that it evaluate her claim based only on the documentation in its possession.  (Def.'s Stmt. of Mat. Fact, ¶ 47.)

Based on the correspondence between the parties, Meredith decided Kecso's appeal based on the information Kecso released prior to March 19, and did not consider her mental health.  Meredith notified Kecso on June 18, 2004 that it had determined she was no longer disabled according to the plan.  Meredith considered the evidence detailed above.

The highlights of Meredith's explanation for its decision follow.  (*See* Def.'s Errata Ex. 2 at 33-37; Def.'s Errata Ex. 3 at 1-2.)  Meredith cited first Dr. David Boarini's letter of December 13, 2002, wherein Dr. Boarini represented that Kecso "recently had a seizure.  She feels back to

normal and was asymptomatic except for that." (Def.'s Errata Ex. 2 at 35.) Meredith asserted

that Kecso began reporting her subjective symptoms including pain, headaches, and fatigue

"well after her tumor was diagnosed, which suggests that her claim for disability may be related

more to her emotional or affective reaction to her diagnosis, rather than having a physiological

origin." (*Id.*) Meredith also emphasized that Kecso did not report headaches to every doctor she

visited throughout the relevant two-year period. (*Id.*)

Additionally, Meredith emphasized that on December 27, 2002 Dr. Friedgood released

Kecso to work without restriction on January 7, 2003. (*Id.*) Meredith describes her visit to

Mayo Clinic as a "self-referral," and notes that although Dr. Raffel released her to work on

February 10, 2003, she did not return to work. (*Id.*) Meredith notes that Dr. Friedgood sent a

certification of disability dated February 27, 2003, which noted Kecso's brain tumor and seizure

disorder rendered her disabled for an unknown duration. (Def.'s Errata Ex. 2 at 36.) Instead of

noting that this certification suggests Kecso was unable to work at that time, Meredith notes that

"No driving," was the only restriction Dr. Friedgood listed. (*Id.*)

Meredith maintains in the denial letter that it paid Kecso's LTD benefits although the

information it received was "vague" and "contradictory to her claimed status." (*Id.*) Meredith

also notes that, contrary to plan requirements, Kecso did not notify it of the status of her Social

Security Disability claims, which McGuire reported Kecso told her were twice denied. (*Id.*)

Meredith next highlights Dr. Friedgood's November 10, 2003 report that notes Kecso

complained of "chronic fatigue and a number of sensory complaints the exact etiology of which

is unknown." Dr. Friedgood noted she was being treated for depression and that because he did

not have an effective treatment for her chronic fatigue, he would discuss the situation with Dr.

Greenberg if the symptoms persisted.  (*Id.*)  Meredith notes that Holly Healey, D.O., its

corporate physician, called Dr. Friedgood on March 1, 2004, and her notes reflect that Dr.

Friedgood put no medical restrictions on Kecso, but stated that her

> return to work is hampered by her somatic complaints of fatigue[,] muscle aches,
> [and] concentration issues.  To his knowledge she is able to function well at home
> but continues to have somatic complaints.  He has no objection to her returning to
> work, perhaps part-time to see how this affects her but recommends we discuss it
> with her.  He notes working will not worsen her brain tumor and as he is unable to
> directly correlate her symptoms with disease process, he is unable to say how
> long her somatic complaints will last.

(*Id.*)  Meredith does not note Dr. Friedgood's letter to Ms. McGuire or his certifications of

disability sent after he found out Meredith was investigating Kecso's continued eligibility for

LTD benefits that report that her headaches and chronic fatigue were caused by her astrocytoma.

Without examining Kecso, Dr. Healey recommended that she return to work, speculated that the

symptoms were possibly related to her depression, and determined that requesting her mental

health records was reasonable.  (*Id.*)

Meredith determined that Kecso's tumor was not "in and of itself" prohibiting her from

working, citing the releases to work immediately after the diagnosis, that she probably had the

tumor long before it was discovered and worked without problems, and that "it is not uncommon

for people who have been diagnosed with such tumors to continue to be employed."  (Def.'s

Errata Ex. 2 at 37.)  Meredith also determined that seizures were not preventing Kecso from

working because she had not experienced a seizure since the initial November 2002 seizure.

(*Id.*)  Finally, Meredith determined that the medical records did not support Kecso's claim that

13

her pain, headaches, and exhaustion were caused by the tumor.  (*Id.*)

To deny her claim that her symptoms were caused by the tumor, Meredith again noted the doctors' releases to work in December 2002 and January 2003, it noted that medical records showed "she functions well at home and can perform the activities of daily living without assistance," and it again noted its speculation that the symptoms were the result of her mental health condition and Dr. Friedgood's statement to Dr. Healey that he could not "directly correlate" her symptoms with the tumor.  (*Id.*)  It noted her treatment sessions with a psychiatrist and psychologist.  Finally, Meredith asserted that Kecso's complaints were subjective, *i.e.*, not discernable by objective medical testing, and that her claim of suffering "constantly from pain, headaches, and fatigue," conflicted with her reporting different symptoms or no symptoms[8] to different doctors.

After Meredith's denial, Kecso filed this action pursuant to 29 U.S.C. § 1132(a)(1)(B), claiming that Meredith wrongfully denied her LTD benefits.   The main issue in the action is whether Kecso's symptoms are caused by the astrocytoma, qualifying her for LTD benefits, or are the result of psychological manifestations, which she "took off the table" for purposes of LTD benefits consideration.  Kecso maintains that the astrocytoma resulted in her severe and continuing pain and discomfort rendering her unable to work at her regular occupation.  She also maintains that manifestations of her condition caused her to suffer constant and severe pain and fatigue resulting in an inability to concentrate or perform basic daily activities.  Meredith

---

[8]Meredith cited Kecso's specific denial of having headaches to Dr. Overton-Kerry, but the record of that appointment does not appear to be in the appendix.

reasserts its position justifying its termination of benefits described above.

## STANDARD OF REVIEW

ERISA gives a plan beneficiary the right to judicial review of a benefits determination. *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1160 (8th Cir. 1998) (citing 29 U.S.C. § 1132(a)(1)(B)).[9] The first consideration in an ERISA case is the appropriate standard of review. An ERISA claim challenging the plan administrator's decision to deny benefits is reviewed by the court *de novo* unless the plan gives the plan administrator discretionary authority to determine eligibility for benefits or to interpret the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Barnhart v. UNUM Life Ins. Co. of America*, 179 F.3d 583, 587 (8th Cir. 1999). If the plan gives the administrator discretionary authority to determine eligibility for benefits, however, the administrator's decision is normally reviewed for an abuse of discretion. *Woo*, 144 F.3d at 1160 (citing *Firestone Tire & Rubber Co.*, 489 U.S. at 115). Under the abuse of discretion standard, the decision to deny benefits will stand if a reasonable person could have reached a similar decision. *Donaho v. FMC Corp.*, 74 F.3d 894, 899 (8th Cir. 1996). A decision is reasonable if it is supported by substantial evidence, and substantial evidence requires "more than a scintilla but less than a preponderance." *Id*. at 900 & n.10 (citation and quotation omitted). In the present case, the parties agree that the plan provides Meredith with discretionary authority to determine benefit eligibility and to interpret the terms of the plan.

Although Kecso acknowledges Meredith's discretionary authority under the plan, she

---

[9] Title 29 U.S.C. § 1132(a)(1)(B) authorizes a participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

argues that Meredith's dual role as plan insurer and administrator, as well as serious procedural irregularities in the review of her claim, caused Meredith to breach its fiduciary duty to provide her with a "full and fair review."  29 U.S.C. § 1133(2).  Such a breach of duty on Meredith's part would require the Court to review its decision under the less deferential "sliding scale" standard of review applied in *Woo*, 144 F.3d 1157, 1160-61 (8th Cir. 1998).

In order to invoke this less deferential standard of review, Kecso must present evidence "establishing that the administrator acted under a conflict of interest, dishonesty, with an improper motive, or without using judgment."  *Wald v. Southwestern Bell Customcare Med. Plan*, 83 F.3d 102, 107 (8th Cir. 1996) (citation omitted).  To determine whether the burden is met, the Court applies a two-prong test: first Kecso must show a palpable conflict of interest or a serious procedural irregularity existed; and second, that the conflict or procedural irregularity caused a serious breach of the plan administrator's fiduciary duty.  *Woo,* 144 F.3d at 1160.  A plaintiff must satisfy both prongs of the *Woo* test to obtain less deferential review; the mere assertion of a conflict of interest or procedural irregularity is insufficient.  *Schatz v. Mut. of Omaha Ins. Co.*, 220 F.3d 944, 948 (8th Cir. 2000); *Layes v. Mead Corp.*, 132 F.3d 1246, 1250 (8th Cir. 1998) (citation omitted).

"*Woo*'s second prong presents a considerable hurdle for plaintiffs."  *Barnhart*, 179 F.3d at 589 n.9 (8th Cir. 1999).  A plaintiff must show that the conflict or procedural irregularity has some connection to the substantive decision reached.  *Woo*, 144 F.3d at 1161 (citations omitted).  "The evidence offered by the plaintiff must give rise to serious doubts as to whether the result was the product of an arbitrary decision or the plan administrator's whim." *Barnhart*, 179 F.3d at

589.  If Kecso establishes both prongs, the Court reviews the benefits determination under the "sliding scale" approach, and the evidence supporting the plan administrator's decision must increase in proportion to the seriousness of the conflict or procedural irregularity.  *Woo*, 144 F.3d at 1162.

## DISCUSSION

### I.      The First *Woo* Prong

Kecso argues that Meredith's status as both plan insurer and administrator constituted a palpable conflict of interest, that Meredith's decision was made according to a procedural irregularity and without proper judgment.

### A.      Conflict of Interest

Under current Eighth Circuit law, "when an entity funds a plan and is also the plan administrator there is a rebuttable presumption of a palpable conflict of interest."  *Tillery v. Hoffman Enclosures, Inc.*, 280 F.3d 1192, 1197 (8th Cir. 2002) (citing *Barnhart*, 179 F.3d at 587-88); *see also Schatz*, 220 F.3d at 947-48 (8th Cir. 2000) (same).  Meredith argues that this presumption is negated because "a benefits determination includes equally compelling long-term business concerns that would encourage insurers to make these determinations in a fair and consistent manner."  *Farley v. Ark. Blue Cross & Blue Shield*, 147 F.3d 774, 777 (8th Cir. 1998); *see also Schatz*, 220 F.3d at 949 ("[I]ndicia of bias can be negated by ameliorating circumstances, such as equally compelling long-term business concerns that militate against improperly denying benefits despite the dual role.") (citation and internal quotations omitted).

In *Farley*, a nonprofit corporation was found not to have a conflict of interest despite its

17

dual role as administrator and insurer. *Id.* Although the court in *Farley* reasoned that long-term business concerns would negate any "indicia of bias" resulting from an insurer serving as plan administrator, the court's ruling rested in part on the lack of any profit motive behind the non-profit corporation's denial of plaintiff's claim. *Id.* at 777 n.5. The compound reasoning of *Farley* makes it difficult for the court to determine whether Meredith's dual role as insurer and administrator, standing alone, created a palpable conflict of interest.

When the Court considers, however, that Meredith is self-insured, its claim that it has long-term business concerns along the same lines as a private insurance company loses strength. As a self insurer, Meredith has no customers other than itself, so its long-term business concerns related to the competition of the marketplace are weak. In addition, in serving as employer, insurer, and plan administrator, the indicia of Meredith having a conflict of interest are substantially enhanced over a situation where an employer secures a private insurance company to insure and administer its disability plan. *See e.g., Schatz*, 220 F.3d at 950. Meredith's "long-term business interest" argument does not rebut the presumption of a conflict of interest and, therefore, the Court concludes Meredith acted under a substantial conflict of interest.

**B.     Serious Procedural Errors**

In respect to Kecso's argument that Meredith's decision was plagued by serious procedural irregularities, she asserts that Meredith violated ERISA requirements, 29 U.S.C. § 1133(2), and Department of Labor ("DOL") claims procedure regulations, 29 C.F.R. § 2560.503-1(m)(8), by failing to provide her with the documents related to both its suspension of her LTD benefits and its initial denial of her claim. She argues that by failing to provide her with the

18

documents supporting these adverse decisions, she could not make an effective claim or appeal,

respectively.  In response, Meredith argues that the only relevant materials in respect to these

decisions were the plan documents, which the parties agree Kecso possessed.

ERISA requires a plan administrator to provide a full and fair review of a benefits

determination.  29 U.S.C. § 1133(2).  DOL regulations regarding full and fair review provide in

pertinent part:

> a claimant shall be provided, upon request and free of charge, reasonable access
> to, and copies of, all documents, records, and other information relevant to the
> claimant's claim for benefits. Whether a document, record, or other information is
> relevant to a claim for benefits shall be determined by reference to paragraph
> (m)(8) of this section . . . .

29 C.F.R. § 2560.503-1(h)(iii).  Referencing paragraph (m)(8) of the section reveals that:

> A document, record, or other information shall be considered "relevant" to a
> claimant's claim if such document, record, or other information.
>
> (i) Was relied upon in making the benefit determination;
>
> (ii) Was submitted, considered, or generated in the course of making the benefit
> determination, *without regard to whether such document, record, or other
> information was relied upon* in making the benefit determination;
>
> (iii) Demonstrates compliance with the administrative processes and safeguards
> required pursuant to paragraph (b)(5) of this section in making the benefit
> determination; or
>
> (iv) In the case of a group health plan or a plan providing disability benefits,
> constitutes a statement of policy or guidance with respect to the plan concerning
> the denied treatment option or benefit for the claimant's diagnosis, without regard
> to whether such advice or statement was relied upon in making the benefit
> determination.

29 C.F.R. § 2560.503-1(m)(8) (emphasis added).  Meredith argues that these regulations

required it to provide Kecso only with documents upon which it relied or which it considered in making its benefits decisions.  Because its first two adverse decisions were based simply on the plan provision that requires a claimant to release all relevant medical records, Meredith argues Kecso was entitled to only the plan document itself.

The plain language of paragraph (m)(8)(ii), however, notes that a document, record, or piece of other information is relevant to a benefits decision if "submitted, considered, or generated" in the course of making the decision "*without regard* to whether [it] . . . was relied upon in making the benefit determination."  29 C.F.R. § 2560.503-1(m)(8)(ii) (emphasis added).  On March 19, 2004, Kecso requested copies of her medical records, the claim file, the standards Meredith was using, the filing procedures employed, and the names, credentials, opinions, and communications of experts reviewing the claims.  In respect to Kecso's request for the filing procedures and the standards employed in the review, Meredith is correct that the plan document was the only relevant document and Kecso admits she had that document.  In respect to Kecso's other requests, however, Meredith violated the DOL regulation requiring it to turn over relevant documents.  These records were submitted, considered, or generated in the course of making the decision, and, contrary to Meredith's argument, the regulation specifically notes that it does not require that the adverse determination relies on the requested records.  Kecso, therefore, has identified a serious procedural irregularity in Meredith's decision making process.

### C.     Use of Proper Judgment

Kecso's third claim is that Meredith denied her claim "without proper judgment."  She argues that Meredith improperly rejected the opinions of her treating physicians and did not give

credence to her subjective reports of pain.  She notes that Meredith did not develop a record of

the physical duties associated with her position and asserts Meredith improperly interpreted

"disability."  Meredith counters Kecso's argument by pointing to multiple places in the record

that it argues show its decision was based on reasonable and appropriate conclusions from the

medical records it received.

In its letter denying Kecso's appeal, Meredith cited as reasons for its denial; 1) doctors

releasing her to work on multiple occasions; 2) her ability to function at home; 3) Dr.

Friedgood's inability to "directly correlate" symptoms with the tumor; 4) the lack of objective

medical evidence to prove her pain and fatigue; 5) Kecso's failure to report headaches, pain, or

fatigue to Dr. Boarini, who treated her immediately after her seizure, her specific denial of

headaches to her family doctor, Dr. Overton-Kerry, and her failure to consistently report

headaches to Mayo Clinic doctors.

Kecso argues that this letter shows Meredith did not use proper judgment because

Meredith relied on substantially the same information to grant her benefits as it did to deny them.

*See e.g., McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002) (determining

plaintiff was disabled pursuant to *de novo* standard because information available to insurer after

it had awarded benefits did not alter plaintiff's status in a significant way); *Gunderson v. WR*

*Grace & Co. Long Term Disability Income Plan*, 874 F.2d 496, 499 & n.3 (8th Cir. 1989)

(concluding the plan's decision failed pursuant to either a *de novo* standard or arbitrary and

capricious standard where the plan relied on essentially the same information to deny benefits as

it did to grant benefits).  The evidence regarding multiple doctors releasing her to work, the fact

that no objective evidence could prove Kecso's pain or fatigue, and her reports to Dr. Boarini and the doctors at the Mayo Clinic were each in the record when Meredith initially granted Kecso LTD benefits.  Meredith's reliance on these records to deny Kecso's LTD benefits claim, therefore, suggests that Meredith did not use proper judgment.

In respect to Meredith's reliance on Kecso doing well at home and painting her daughter's bedroom, Meredith cited nothing relating to the duties she would have to fulfill at home besides that she did the painting project.  Markedly missing from the record is any description of "the material duties of [Kecso's] regular occupation at Meredith, and [whether she] would be unable to perform similar duties at any other employer."  (Plf.'s App., Ex. A at 11.)  This is the standard for disability set out in the plan.  As noted by Kecso, neither at the time Meredith denied her claim nor currently before the Court, was or is there a description of Kecso's material job duties.  The Eighth Circuit notes in *Schatz*, 220 F.3d at 949, however, an employer that is also the insurer and administrator is presumed to know the employee's duties.  Meredith's failure to tie its decision to the standard for disability by listing Kecso's material duties does not suggest it used improper judgment.

Meredith also cites Dr. Friedgood's report to Meredith's Corporate Medical Director, Dr. Healey, that he could not "directly correlate" Kecso's symptoms with her astrocytoma.  Reliance on this statement is unsound, however, because for a person to be able to say an effect is *directly* correlated with a cause, that person must be 100% certain of the relationship.  Dr. Friedgood's candid response is weak evidence of any inconsistency of his opinion.  See *Norris*, 308 F.3d at 885 (concluding administrator abused its discretion partly because plan "medical director seized

22

upon several equivocal statements" by insured's primary care physician).  This is true especially
in light of Dr. Friedgood's December 31, 2003 letter to Ms. McGuire and his February 4, 2004
certification of disability, which both state that Kecso's headaches and fatigue were caused by
the tumor and associated seizure disorder.

In addition to the reasons in its denial letter, Meredith bolsters its decision by citing
medical evidence outside that cited in the letter.  Meredith again cites Dr. Friedgood's reports
that it argues are inconsistent in respect to attributing Kecso's subjective complaints to her
tumor.  Meredith also cites Kecso's seizures being controlled; Dr. Friedgood's report to Dr.
Healey, that Kecso has "no medical restrictions," is able to function at home, and that he did not
have a problem with her returning to work if she could handle it; the reports of Ms. McGuire and
its in-house physician, Dr. Healey, who both opined that Kecso had not established a disability;
and, although Ms. Walsh treated Kecso for mental health, which Meredith said did not factor
into its decision, Meredith cites the reports from Ms. Walsh showing Kecso had no vocational
impairment.

As its reasons for not deferring to Dr. Friedgood's opinion, Meredith points to Dr.
Friedgood's August 2003 report, which notes that Kecso's pain and fatigue were of an unknown
etiology.  Meredith also cites his certifications of disability sent to the company with "symptom
blanks" that did not include pain, headache, and fatigue, but instead noted only that Kecso had a
brain tumor and seizure disorder.  Additionally, Meredith notes that Dr. Friedgood did list
Kecso's symptoms on the certifications of disability when it became clear that Meredith doubted
her disability.  In so many words, Meredith suggests that this last act shows Dr. Friedgood was

complicit in Kecso feigning her disability.  On the contrary, the Court finds that Dr. Friedgood's

action shows that when Meredith began questioning Kecso's qualification for LTD benefits, Dr.

Friedgood realized that he had to tell Meredith repeatedly what he thought obvious.  These

asserted inconsistencies and omissions are not material when viewed in the context of the entire

record.  *See Norris v. Citibank, N.A. Disability Plan (501)*, 308 F.3d 880, 885 (8th Cir. 2002)

(concluding that denial of benefits was abuse of discretion where plan administrator disregarded

treating doctor's finding of disability where claimant attempted to return to work and failed and

administrator relied on plan-employed doctor who reviewed claimant's records and spoke with

treating doctor to reach a different conclusion).

Meredith next cites Dr. Healey's and Ms. McGuire's opinions that Kecso was not entitled

to benefits.  Meredith asserts that ERISA plan administrators are not obliged to give opinions of

treating doctors deference over opinions of non-treating doctors.  *See Black & Decker Disability

Plan v. Nord*, 538 U.S. 822, 825 (2003).  *Nord*, however, does not stand for the proposition that a

plan administrator need not ever give deference to a treating physician.  *Id.*  The Court in *Nord*

sought to preserve flexibility in plan administrators' decision making process by not imposing a

rule requiring a plan to give deference to a treating doctor in cases where the treating doctor may

have only treated a claimant for a short time or may have had less expertise than a specialist

engaged by the plan administrator.  *Id.* at 832.  A plan administrator, however, may still act

without proper judgment or abuse its discretion by failing to give deference to the decision of a

treating doctor who is a specialist in the area with respect to the claimant's disease and who

treats the claimant over a long period if the plan gives deference to its own doctor who is a

general practitioner and never examined the claimant, which is substantially the case here.  *Woo*, although decided before *Nord*, found the plan acted without proper judgment by failing to employ an independent specialist to review the claimant's complex diagnosis and instead had an in-house doctor review the claim.  144 F.3d at 1161.

Meredith disregarded Dr. Friedgood's opinion that Kecso's pain, headaches, and fatigue were due to her astrocytoma despite his credentials as a neurologist—a specialist in brain function—and the fact that he treated Kecso for over two years, from the time her tumor was diagnosed, before Meredith terminated her LTD benefits.  Meredith deferred to its reviewing doctor, Dr. Healey, apparently a general practitioner, who is employed by Meredith and never examined Kecso, but who reviewed her medical records and spoke to Dr. Friedgood.  *See Norris*, 308 F.3d at 885.  Meredith also deferred to Ms. McGuire, a nurse who also reviewed Kecso's medical records and interviewed her under the guise of coordinating her treatment.

Meredith also strenuously argues that it used proper judgment[10] in its denial of Kecso's claim because she failed to release Ms. Walsh's records.  Kecso's benefits were suspended and initially rejected on that basis.  Meredith decided the appeal, however, based on its conclusion that Kecso had not shown that her brain tumor and associated symptoms were disabling.  That is the decision the Court reviews.  Meredith's arguments in relation to Kecso not releasing Ms. Walsh's records, therefore, are irrelevant as to whether it used proper judgment.

---

[10]Meredith makes this argument and others in arguing that it did not abuse its discretion, but considering that the Court's "proper judgment" analysis and its abuse of discretion analysis are substantially parallel exercises, the arguments transfer back and forth.  *See e.g., Schatz v. Mutual of Omaha Ins. Co.*, 220 F.3d 944, 950 (8th Cir. 2000) (finding substantial evidence discussion in second prong of *Woo* analysis mirrors merits analysis of substantial evidence).

To the extent that Meredith argues that Kecso's affective disorder might have been the cause of her symptoms, the Court finds that this is unfounded speculation. Meredith decided the appeal taking her mental health "off the table." Speculating that Kecso's symptoms were due to her mental health is not "taking it off the table." Additionally, Meredith cites reports from Kecso's therapist showing Kecso was not vocationally impaired. Ms. Walsh, however, was treating Kecso for her affective disorder, and evidence that Ms. Walsh found no vocational impairment is neutral at best, but strongly suggests that Kecso's depression did not affect her ability to perform her job, which is contrary to Meredith's supposition.

Viewing Kecso's records as a whole, and not simply focusing on excerpts here and there, Meredith did not employ proper judgment when reviewing Kecso's claim. *See id.*

### D. Conclusion on First Woo Prong

Pursuant to the foregoing discussion, applying the Woo first-prong factors, the Court finds that Meredith had a serious conflict of interest, committed procedural irregularities, and acted "without proper judgment" under the first prong of *Woo*, 144 F.3d at 1161.

## II. The Second *Woo* Prong

As noted above, a conflict of interest or procedural error in the benefits decision does not automatically require the court to abandon the abuse of discretion standard of review in favor of "sliding scale" deference. *Barnhart*, 179 F.3d at 589 n.9. The conflict or procedural irregularity must have some connection to the substantive decision reached. *Woo*, 144 F.3d at 1161 (citations omitted). On the basis of the preceding discussion, the Court is left with "serious doubts as to whether the result was the product of an arbitrary decision or the plan

administrator's whim." *Barnhart*, 179 F.3d at 589.   Meredith's position as employer, insurer, and administrator is beyond the usual case of a conflicted plan administrator because usually the insurer/administrator is not also the employer.  *But see Schatz*, 220 F.3d at 950 (holding an employer, that was plan insurer and administrator, did not act under its conflict of interest).  As Kecso's employer, Meredith not only had the interest of not paying the claim, but had the added interest in having Kecso return to work to fulfill its business needs.  Its failure to comply with DOL regulations and its failure to use proper judgment in making its decision show that its conflict of interest influenced the substantive decision it reached.  That decision, therefore, is not entitled to deference usually accorded plan administrators that reserve themselves discretion. Due to the serious nature of its conflict of interest, Meredith's decision will be reviewed with deference approaching *de novo* review on *Woo's* sliding scale.

### III.     Review of Meredith's Decision to Deny Benefits

Applying *Woo's* sliding scale approach, "the evidence supporting the plan administrator's decision must increase in proportion to the seriousness of the conflict or procedural irregularity." *Woo*, 144 F.3d 1157, 1162 (8th Cir. 1998).  Because Meredith's conflict of interest was serious and it failed to apply proper judgment, *Woo* requires "that the record contain substantial evidence bordering on a preponderance to uphold" Meredith's decision.  *Id.* at 1162.  Further analysis is unnecessary to find that its decision was not supported by a preponderance of evidence.  *See Schatz,* 220 F.3d at 950 (finding substantial evidence discussion in second prong of *Woo* analysis mirrors merits analysis of substantial evidence).  The analysis above describes the substantial amount of evidence supporting Kecso's claim and the

far less substantial amount supporting Meredith's decision.

## CONCLUSION

For the reasons articulated above, Meredith wrongfully denied Kecso's claim for long-term disability benefits; Kecso's motion for summary judgment (Clerk's No. 36) is **GRANTED**; and Meredith's motion for summary judgment (Clerk's No. 34) is **DENIED**.  The Clerk of Court is **ORDERED** to enter judgment in favor of plaintiff Nancy Kecso.

Dated this 11th day of April, 2006.

RONALD E. LONGSTAFF, Chief Judge
United States District Court